UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FITNESS INTERNATIONAL, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-1565 |
| | § | |
| SHERIDAN HILLS DEVELOPMENTS, L.P., | § | |
| *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

This case was tried to the Court in a four-day bench trial beginning on April 19, 2016. Having considered the testimony, evidence, pleadings, arguments of counsel, and the applicable law, the Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).[1]

## I.      Findings of Fact

**A.      Identification Of The Parties**

1.      Plaintiff Fitness International, LLC ("Fitness" or "Tenant") is a California limited liability company with its principle place of business in California (Plaintiff's Original Petition ["Pet."], ¶2; Dkt. 33, ¶2).  Fitness operates an "LA Fitness" athletic club at 2130 West Holcombe Boulevard, Houston, 77030 in Harris County, Texas. (Pet., ¶2; Dkt. 32, ¶ 4; Dkt. 33, ¶ 4).

2.      Defendant Life Science Plaza Investment Group, LP ("Life Science" or "Landlord") is Delaware limited partnership.  It owns the real property located at 2130 West Holcombe Boulevard, Houston, 77030 in Harris County, Texas, together with the improvements

---

[1] Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed. All relief not granted is expressly denied.

thereon, known as the Life Science Plaza in the vicinity of the Texas Medical Center area of Houston, Texas.  (Dkt. 29).

3.      Sheridan Hills Developments, L.P. ("Sheridan Hills" or "Landlord") was formerly the defendant in this action as the former owner of the real property and the improvements located at 2130 West Holcombe Boulevard, Houston, 77030 in Harris County, Texas known as the Life Science Plaza.  (Dkt. 29).

4.      Life Science was substituted for Sheridan Hills as the defendant in this action by Order of this Court on January 28, 2016 (Dkt. 30).

**B.      Jurisdiction and Venue**

5.      The Court has jurisdiction over all parties and over this action based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. Furthermore, the amount in controversy in this action is within the jurisdictional requirements of 28 U.S.C. § 1332.  Venue is proper in the Southern District of Texas, Houston Division, pursuant to 29 U.S.C. §1391(b)(2) and §1441(a).

**C.      The Building And Complex**

6.      Life Science Plaza consists of a medical office building located at 2130 West Holcombe Boulevard, Houston, Texas (the "Building"), together with "the Land [on which it is situated], related pedestrian walkways, landscaping, fountains, roadways and parking facilities (including the Garage . . . and such additional facilities to service any of the foregoing . . . (the "Complex")."  (Lease, §§1.A, 6.B).

7.      Construction of the Complex was completed in late 2008.

8.      The parties agreed that the Building contained 315,000 square feet of Net Rentable Area at its completion. In July 2015, Landlord unilaterally reduced the Net Rentable Area of the Building by approximately 9,000 square feet and increased Fitness' Pro Rata Share of Operating Expenses from 17.35% to 17.85%.

2

9.      Fitness operates an LA Fitness Signature athletic club in a three story space in the Building and uses the parking garage. The Signature designation is used for LA Fitness's more exclusive athletic clubs.

10.      Fitness completed the build out of its LA Fitness athletic club and opened for business on or about March 13, 2009.  It has been operating continually since that time. (Dkt. 32, ¶ 6; Dkt. 33, ¶ 6).

18.      On or about December 21, 2015, Sheridan Hills effectively sold to Life Science the Complex.   (Dkt. 29).

19.      The Complex operates on a 24 hour/7 day per week basis.

**D.      Negotiation of a Lease**

20.      Landlord and Tenant and their counsel extensively negotiated the terms of a lease for the space for Fitness to operate an LA Fitness club in the Building.

21.      Landlord and Tenant executed a letter of intent dated July 25, 2005 (the "Letter of Intent").

22.      The letter of intent states that (other than the confidentiality obligation) its terms are "non-binding on either party and only a fully executed lease shall obligate Landlord or Tenant."  (Letter of Intent, at LAF0008).

**E.      The Lease Agreement**

23.      Before the Building's construction, on January 29, 2007, Sheridan Hills, as Landlord, and L.A. Fitness International Texas, L.P., as Tenant entered into a Lease Agreement (the "Lease").

24.      Landlord leases to Tenant "approximately 54,102 square feet of Net Rentable Area…(the 'Leased Premises') in the medical office building located at 2130 West Holcombe Boulevard, Houston, Harris County, Texas 77030 (the 'Building')…." (Lease, §1.A).

3

25.     After construction of the Building, the parties agreed that the Leased Premises consists of approximately 54,643 square feet of Net Rentable Area.  (Acceptance of Premises Memorandum ¶1, at LAF0133).

26.     The Lease also leases to Tenant "certain parking spaces on the terms, conditions and agreements of Landlord set forth in Exhibit C attached hereto and made a part hereof for all purposes." (Lease, § 1.C).

27.     On June 30, 2007, L.A. Fitness International Texas, L.P. assigned the Lease to Fitness.

28.     Fitness completed the build-out of its LA Fitness athletic club and opened for business on March 13, 2009.   The Rent Commencement Date is also March 13, 2009 (Acceptance of Premises Memorandum, ¶5).  Fitness has been operating its LA Fitness athletic club in the Building since that time.

29.     Landlord and Tenant executed an Acceptance of Premises Memorandum on January 12, 2010 that amended certain terms of the Lease.

30.     As part of the sale of the Complex, Sheridan Hills and Life Science executed a Distribution Agreement in which Sheridan Hills assigned, and Life Science accepted, assignment of the lease with Tenant. The Distribution Agreement expressly provides that Life Science "assumes all duties and obligations of [Sheridan Hills] in connection with the [lease]." (Distribution Agreement §1.6 at Exhibit A to Dkt. 29).

31.     The term of the Lease is for a 180 month (15 year) primary term upon the Commencement Date.  (Lease, §2(A)). The Lease Commencement Date was November 13, 2008 and it has an initial Expiration Date of March 31, 2024. (Acceptance of Premises Memorandum, ¶¶4,5).

4

**F.      Access and Rights of Fitness Under the Lease**

32.      The Lease grants Fitness, its employees, licensees, and invitees and other visitors, a right to access the Building, the Leased Premises, and the Common Areas, as those terms are defined in the Lease and the Acceptance of Premises Memorandum.  (Lease, § 1(A); Acceptance of Premises Memorandum ¶1).

33.      The Lease also specifies certain permitted and restricted uses of the Leased Premises. (Lease, §§ 3,4).  Section 3 of the Lease states that the "Leased Premises shall not be used for any purpose which would violate any other tenants' exclusive use, if any, previously granted by Landlord, including, without limitation, the exclusive uses granted on Exhibit P attached hereto…."  Landlord granted another tenant exclusive use of  "[a] long term acute care hospital…." (Exhibit P).

34.      Following Fitness' execution of the Lease, the Landlord placed tenants in the tower portion of the Building that operate twenty-four (24) hours a day, seven (7) days a week.

35.      Since January 1, 2010, pursuant to a lease with Landlord, Select Hospital, an acute care hospital, has occupied the sixth and seventh floors of the medical office tower.  Select Hospital is open twenty-four (24) hours a day, seven (7) days a week.

36.      Since September, 2013, pursuant to a lease with Landlord, MD Anderson, a medical lab, has occupied the 9th, 11th and 12th floors of the medical office tower.  MD Anderson is open twenty-four (24) hours a day, seven (7) days a week.

34.      The Lease also gives Fitness the right to operate its fitness club 24 hours a day, seven (7) days per week. (Lease, Exhibit C§ 1; Exhibit H).

**G.      Payment of Rent**

35.      The Lease requires Fitness to pay "Rent" composed of both fixed "Base Rent" and variable "Additional Rent." (Lease, §§ 5,6).

36.     Section 6 of the Lease addresses the payment and calculation of Additional Rent, which is defined as "Tenant's Pro Rata Share of the Operating Expenses (as hereinafter defined)…." Tenant's Pro Rata Share is calculated by dividing the Net Rentable Area in the Leased Premises by the Net Rentable Area of the Building.  (Lease, §6.A).

37.     Landlord used 315,000 square feet as the Net Rentable Area for the Building for calculation of the Tenant's Pro Rata Share of Operating Expenses from 2009 through 2013. Tenant's Pro Rata Share for those years was calculated as 17.35%.

38.     For the determination of the 2014 Operating Expenses, Landlord recalculated the square footage of the Building to 306,183 and used this for the calculation of Tenant's Pro Rata Share of Operating Expenses.  Under this metric, Tenant's Pro Rata Share for 2014 was 17.85%.

39.     In 2015, when Landlord built-out part of the Building, Landlord calculated that the Building's square footage increased to 334,723, reducing Tenant's Pro Rata Share to 16.31%.

40.     Although Landlord consulted an architect about this change, it did not consult Fitness.

41.     Under Section 6.E of the Lease, Landlord is to prepare at the beginning of each year a Good Faith Estimate of the Additional Rent for the following year. The Lease requires Tenant to pay monthly the Base Rent owed and 1/12th of that estimated amount. If Landlord does not provide the estimate, Tenant continues to pay Estimated Additional Rent based on the prior year's estimate.

42.     Section 6.F also provides that after the end of each calendar year during the Lease Term, subject to the availability of the necessary financial information, Landlord performs a true up or Annual Expense Reconciliation, to calculate the *actual* Operating Expenses to determine the Adjusted Additional Rent. Landlord is to provide an Operating Expense Statement showing,

*inter alia*, the actual amount of the Operating Expenses incurred by Landlord for that calendar year and the amount of any overpayment to be credited to Tenant or any deficiency payable to Landlord.

43.     If the Adjusted Additional Rent is greater than the Estimated Additional Rent, the Lease requires Tenant to pay the difference within thirty (30) days of Tenant's receipt of the Operating Expense Statement. (Lease, §6.J).

44.     Section 6.F further states that "[i]n the event [the] Operating Expense Statement is inaccurate, Tenant's sole remedy with respect to such inaccuracy shall be to exercise its right to conduct an audit of Operating Expenses pursuant to Section 6.J . . ." Section 6.J further permits a "reimbursement" only "if following such audit, it is conclusively determined that the Adjusted Additional Rent paid by Tenant exceeds the actual Additional Rent for said calendar year."

**H.      Operating Expenses Under the Lease**

45.     The Lease provisions regarding Operating Expenses were tightly negotiated and important to both parties when negotiating the Lease.

46.     Section 6.B of the Lease states that "Operating Expenses" as used in the Lease:

> shall mean all expenses, costs and disbursement in connection with the ownership, operation, management, maintenance and repair of the Building, the Land, related pedestrian walkways, landscaping, fountains, roadways and parking facilities (including the Garage [as defined on Exhibit C]), and such additional facilities to service any of the foregoing in subsequent years as may be necessary or desirable in Landlord's discretion (the Building, the Land and said additional facilities hereinafter sometimes referred to as the "Complex"), including but not limited to…." (brackets in original).

47.     In the subparagraphs following Section 6.B's list of general and specific categories of expenses, is a further list of 11 specific inclusions in the definition of "Operating Expenses" of certain important categories of costs and expenses including: (1) Wages and salaries of employees engaged in the operation, security and cleaning and maintenance of the

Complex; (2) Cost of all utilities for the Common Areas; (5) Cost of all insurance relating to the Complex; (6) all taxes attributable to the Complex; (8) Property management fees; (9) Cost of repairs and general maintenance for the Complex; and several other categories of costs.

48.     The Lease defines Common Areas as "[f]acilities and areas of the Building that are intended and designated by Landlord from time to time for the common, general and non-exclusive use of all tenants of the Building." Lease, §1.A. As stated in Section 6.B, Fitness's obligation to pay as Additional Rent its pro rata share of Operating Expenses is not limited to only those expenses that might relate to the ownership, operation, maintenance, maintenance, and repair of the Common Areas.

49.     The Lease also specifically includes in Operating Expenses at §6.B(4):

> Cost of all maintenance and service agreements for the Common Areas and the equipment related thereto, including alarm service, security service, window cleaning, janitorial service, trash removal and elevator maintenance to the extent relating to all Common Areas other than those contained on the second (2nd) floor and above in the tower portion of the Building….

50.     Section 6.C then includes a separate list of 35 costs and expenses that "shall not be included in or considered as Operating Expenses."  This list includes, for example: (4) "Landlord's cost of HVAC, electricity, water, janitorial and other services or benefits sold or charged to individual tenants in the Complex"; (11) "Compensation paid to clerks, attendants or other persons in commercial concessions operated by Landlord or the property manager"; (28) "Costs or expenses regarding any portion of the Complex that only directly benefits other tenant(s) but not Tenant (e.g., internal hallways and corridors of office tower floors, elevators that do not serve the parking floors below the office lobby, bathrooms of office tower floors, HVAC equipment serving only the office tower floors)."

51.     Fitness agreed to pay its proportional share of "all" expenses and costs "in connection with the ownership, operation, management, maintenance and repair . . . of the Complex" except for those costs specifically excluded.

## I.     2009-2013 Adjusted Additional Rent.

52.     Fitness paid its Base Rent and a portion of the Additional Rent (i.e., a portion of its Pro Rata Share of the Operating Expenses) for each of 2009, 2010, 2011, 2012, 2013, and 2014. It has continued to pay through the present.

53.      Pursuant to the obligations set forth in Section 6.F of the Lease, after each year end, Landlord completed the "true up" Annual Expense Reconciliation to calculate the actual Operating Expenses and Additional Rent to determine the Adjusted Additional Rent and issued invoices to Fitness for the resulting deficiencies.

54.     Between 2010 and 2015, Landlord provided multiple statements and invoices requesting the amounts owed for Operating Expenses as Adjusted Additional Rent from Fitness.

55.     After receiving Landlord's Default Notice of August 6, 2012, for nonpayment of 2009 and 2010 Operating Expenses, Fitness paid the 2009 and 2010 Operating  Expense invoices "under protest" on August 8, 2012.

56.     On March 19, 2014, after receiving Landlord's Default Notice on March 5, 2014, Fitness paid the invoiced amount for 2011 Operating Expenses "under protest."

57.     On June 4, 2015, after a thorough review of Operating Expenses charged for 2009, 2010, 2011, 2012 and 2013, Landlord sent Fitness a Revised Statement of Operating Expenses for 2009, 2010, 2011, 2012 and 2013 ("Revised 2009-2013 Statement") (Exhibit 46).

58.     The amounts paid by Fitness for 2009, 2010, 2011, 2012 and 2013 for Operating Expenses are reflected in the Revised 2009-2013 Statement as summarized below:

| Summary of Revised Fitness International Operating Expenses 2009 to 2013 | | | | | |
|---|---|---|---|---|---|
| | | | Fitness International | | |
| | Revised Statement | Fitness International | prior payments | Overpayment of | Unpaid Balance of |
| Year | of Operating Expenses | Share of Operating Expenses | of Operating Expenses | Operating Expenses | Operating Expenses |
| 2009 | $3,370,089.59 | $443,522.23 | ($473,679.32) | $30,157.09 | |
| 2010 | $3,851,989.14 | $675,383.11 | ($681,591.80) | $6,208.69 | |
| 2011 | $3,828,469.86 | $671,304.80 | ($677,387.97) | $6,083.17 | |
| 2012 | $3,668,313.86 | $643,871.10 | ($637,618.44) | | $6,252.66 |
| 2013 | $4,400,400.98 | $771,487.40 | ($637,618.44) | | $133,868.96 |
| | | | | $42,448.96 | $140,121.62 |
| | | | | Net Due from Fitness Int'l | $97,672.66 |

59.     The Revised 2009-2013 Statement made adjustments to the Operating Expense calculations for prior years totaling $42,448.96, and amended and addressed some of Fitness's concerns regarding inaccuracies in the actual Operating Expense calculations, providing credits where Landlord determined they were due. Landlord credited the $42,448.96 of adjustments towards Fitness's unpaid balances of Operating Expenses due pursuant to the Lease terms. It also included as credits Fitness's payments to Landlord of the 2009, 2010, and 2011 invoices.

60.     According to Landlord, the net deficiency owed by Fitness for Operating Expenses for 2009 to 2013 was $97,672.66.  Fitness did not timely pay this invoiced amount. On July 10, 2015, Landlord sent a notice of default letter requesting payment on or before July 20, 2015.

61.     Fitness ultimately paid the $97,672.66 balance due for 2012 and 2013 Operating Expenses to Landlord "under protest" on July 20, 2015.

62.     Landlord has not taken any actions that interfere with Fitness's quiet enjoyment of the Leased Premises.

**J.     2014 Operating Expenses**

62.     As with the prior years, after its review of the actual Building Operating Expenses for 2014, Landlord sent Fitness on June 17, 2015, a 2014 Operating Expense Statement and Invoice for Deficiency of Adjusted Additional Rent Due in the amount of $263,509.96.

63. On September 18, 2015, Fitness's attorney responded by letter that "Landlord's suggestion that any additional monies are due and owing under the Lease is erroneous and any suggestion that Tenant is in default of any provision of the Lease is rejected," refusing to pay the owed Adjusted Additional Rent under the Lease.

64. Fitness has not made any payment to Landlord of the 2014 Adjusted Additional Rent owed.

**K.** **Facts Relating to the Parking Garage**

65. Parking was very important for Fitness in the negotiation of the Lease. The negotiation over parking language was extensive. As part of the Lease, Landlord and Tenant incorporated Exhibit C named "Parking Agreement."

66. Exhibit C sets forth the numbers of parking spaces Landlord is obligated to construct and make available to Tenant as reserved spaces on the basement level and second floor of the Garage for the exclusive use by Tenant and its customers, guests, invitees, licensees and employees. The Garage's operating hours are set forth as 24 hours a day, seven days a week. (Lease, Exhibit C §1).

**General Operating Expenses**

67. Fitness contends that it need not pay any Operating Expenses for the Garage because, among other things, the Garage is not part of the Common Areas of the Building.

68. In the Lease, "Building" is defined as "the medical office building located at 2130 West Holcombe Boulevard . . . ." Lease at §1.A.

69. "Garage" is defined in Exhibit C to the Lease as "no less than eight hundred fifty (850) total parking spaces in the parking garage associated with the Building…." Lease at C-1.

70.    "Common Areas" is defined as "[f]acilities and areas of the Building that are intended and designated by Landlord from time to time for the common, general and non-exclusive use of all tenants of the Building . . . ." Lease at 1 §1.

71.    The Court finds that the Garage is not part of the Common Areas. The Common Areas are specifically defined too include only "Facilities and areas of the *Building* . . . ." (emphasis added). The Garage is not part of the Building. Therefore, the Garage is not part of the Common Areas.

72.    However, even though the Garage is not part of the Common Areas, Fitness must pay its pro rata share of general Operating Expenses for the Garage. Section 6B expressly requires Fitness to pay for "[a]ll Operating Expenses . . . *including the Garage* . . . ." Lease at 9 (emphasis added). Because the parties took the trouble to specifically include the Garage in Operating Expenses and never specifically excluded it later, the Court finds that Fitness must pay for it.

### Parking Attendants

73.    Fitness argues that it need not pay the cost of parking attendants at the Garage because the Garage is a commercial concession under the Lease.

74.    Pursuant to §1.C. and Exhibit C of the Lease, Landlord leases to Fitness, "at no additional cost or expense," parking spaces in the Garage.

75.    Pursuant to an agreement between Landlord and Republic Parking Systems, employees of Republic Parking Systems manage the Garage.

76.    Landlord is not obligated to charge for parking.  Landlord could elect to provide parking free of charge. Through its parking concession, Landlord charges tenants and the public

at large on an hourly, daily, and monthly basis are charged for access to the Garage on an hourly, daily and monthly basis.

77.     The Lease excludes "[c]ompensation paid to clerks and attendants or other persons in commercial concessions operated by Landlord or the property manager." Lease § 6C(11). The Lease also excludes "any special assessment of taxes . . . including, but not limited to, such items as parking income taxes." § 6C(16). Finally, the Lease excludes "[a]ny cost of expense to the extent Landlord is reimbursed, receives a credit or is otherwise compensated (other than tenant reimbursements for Operating Expenses)." § 6C(29).

78.     The parties disagree as to whether the parking system at the Garage is a "commercial concession" within the meaning of the Lease. The term is not defined.

79.     Fitness, citing an American Heritage Dictionary, posits that a "concession" is "the privilege of maintaining a subsidiary business within certain premises." It sees the Republic Parking System as a subsidiary business within the Complex, and argues that its cost should be excluded.

80.     Landlord argues that the Parking System cannot be a concession because it is a necessary service. Landlord, citing what the Court believes was a Webster's dictionary, posits that "concession" means a "usually exclusive right to undertake and profit by a specified activity."  Lawrence Lubin, a principal of Landlord who was closely involved in negotiating the Lease, testified that the Building could not operate "for a day" without parking. Lubin testified that having parking attendants at a garage in the Medical Center in Houston is necessary because otherwise the parking spaces would fill up quickly and tenants would have no place to park. Lubin believes that a commercial concession is something like a hot dog stand at a baseball game or a sundry flower shop at a hospital; something run for profit, small in nature, and not a

necessity. Lubin also testified that the Garage operates at a loss and so cannot be a for-profit commercial concession.

81.     The Court notes Lubin's testimony that it would be difficult to operate the Complex without charging for parking. But that does not mean that Fitness agreed to pay for attendants.

82.     None of the testimony helps the Court overmuch in fixing the definition of "concession" under the Lease. As is often the case, the different dictionaries provide differing definitions of the term.[2] And although the Court notes Lubin's testimony, Lubin was only one party to a contested two-party negotiation. What matters is not what one party intended, but what both parties intended and memorialized in writing.

83.     So the Court is left to look to the language of the Lease. The Lease specifically excludes "[c]ompensation paid to clerks and attendants or other persons in commercial concessions operated by Landlord or the property manager." Lease § 6C(11). The Lease also excludes "any special assessment of taxes . . . including, but not limited to, such items as parking income taxes." § 6C(16). And the Lease excludes "[a]ny cost of expense to the extent Landlord is reimbursed, receives a credit or is otherwise compensated (other than tenant reimbursements for Operating Expenses)." § 6C(29).

84.     Give the above language, the Court finds that the parking system operated by Republic Parking is a commercial concession within the meaning of the lease and that its cost should be excluded from Fitness' Additional Rent. First, the Lease excludes compensation paid to "clerks and attendants." § 6C(11). The word "attendant" is commonly used to refer to a

---

[2] The parties also point to the United States Parks and Wildlife System's definition of a concession, which helps not at all since this commercial lease has nothing to do with the Parks and Wildlife System.

parking attendant. In fact, the Court is hard-pressed to find another type of attendant that would fit better in this context. Other employees of the Complex such as janitors, front-desk people, security guards, etc. would probably not be referred to as attendants. The word "clerk" can also be used to denote an employee in a parking garage.

85.     In addition, the Lease excludes "any special assessment of taxes . . . including, but not limited to, such items as parking income taxes." § 6C(16). The fact that the Lease singles out parking income taxes but no other category of taxes reinforces the conclusion that the parties did not intend for Fitness to pay for parking expenses.

86.     Finally, the Lease excludes "[a]ny cost of expense to the extent Landlord is reimbursed, receives a credit or is otherwise compensated." § 6C(29). Landlord is reimbursed for the expense of the Garage through the Parking System. Although this term may be broad enough to encompass more than parking, it also adds to the conclusion that Fitness was not expected to pay for the Parking System under the Lease.

87.     Accordingly, the Court finds that the Garage is a commercial concession under the Lease and Fitness need not pay for the cost of parking attendants.

**L.     Facts Relating to Security at the Complex**

99.     Landlord is obligated under the Lease to provide on-site security and patrol personnel and equipment for the Building.  The Lease states that Landlord is not responsible for the adequacy or effectiveness of such security as long as the "scope and extent of the security services contracted for and by Landlord are in keeping with the standards of other Comparable Buildings." (Lease, §7.A(5)).

100.     Landlord contracted with Locke Protective Services, Inc. ("Locke Security") to provide security services for the Complex.  Locke Security has provided security services for the Complex from 2009 to the present.

15

101.    There are currently two (2) guards on-site 24 hours per day, 7 days per week. There is a security desk on the first floor lobby level. The Complex also has 128 security cameras that are monitored by the Locke Security guards.

102.    Fitness argues that Landlord is overcharging it for security because the Complex has two security guards but Fitness thinks it only needs one. One guard sits at a desk in the lobby of the Common Area. He checks people in as they ascend to the Tower and monitors security cameras. The other guard roves. Plaintiff argues that Fitness doesn't need that much security and that the two-guard staffing level is because of the 24-hour tenants, which require greater security.

103.    The Court rejects this argument. Nothing in the Lease allows Fitness to decide how much security the Building should have. The Lease excludes the cost of security "to the extent relating to" all Common Areas above the first floor. But the security guards do not spend much, if any, time in the Tower. Although they check in Tower patrons, the security guards spend their time in the lobby and roving the grounds. That cost is not excluded.

104.    Fitness also argues the cost should be excluded by 6C(28), which excludes costs that only directly benefit other tenants. But extra security does not "only directly benefit" the hospital. Security benefits everyone. For example, people are less likely to vandalize the Building—Fitness' space included—if there are security guards on duty. So although the security might benefit Fitness less than the 24-hour tenants, it still benefits Fitness. In addition, the exemplary costs provided in this section are instructive. The examples given are internal hallways or bathrooms of office tower floors. §6.C.(28). These literally do not provide any benefit to Fitness and are properly excluded. Security is an expense that benefits all tenants, albeit to differing degrees, and therefore is not excluded.

**M.**     **Facts Relating to Utilities at the Complex**

105.     Landlord bills the Common Area Utilities to tenants using the following formula: Common Area Utilities= A-(B+C), A being the Landlord's total Complex bills for electricity and water, B being the total electrical and water metered for tenants, and C being the total HVAC electrical metered by BTU meters for Tenants.

106.     The tenants were not billed for the BTU charges, which includes the electrical consumption related to HVAC usage, in 2009, 2010 and 2011. If Landlord had billed Fitness for the BTU charges for those years, Fitness would have owed more.

**N.**     **Facts Relating to HVAC**

107.     Landlord is required to "furnish Building standard chilled water and electrical service for Tenant's air conditioning and heating at such temperature and in such amounts as are considered to be standard for fitness center use in buildings of comparable quality in the vicinity of the Medical Center area of Houston, Texas, twenty-four (24) hours per day, seven (7) days per week." (Lease, Exhibit H).

108.     Tenants are submetered with a BTU meter for their use of the chilled water for air conditioning.

109.     There are two air handling units ("AHUs") for each floor on levels 8, 9, 10, 11, and 12 of the Building as well as one for the penthouse. Costs of maintaining the AHUs and controls for other tenants are billed back to that tenant and credited against Operating Expenses.

110.     Tenant Select Hospital on levels 6 and 7 of the Building has and maintains all of its equipment.

**O.**     **Facts Relating to Electricity at the Complex**

111.     Landlord is obligated to maintain the electrical systems and operation for the Complex under the Lease. (Lease, §7.A; Exhibit J).  This includes not only maintaining the

central switch gear and electrical systems supporting the central plant, but also the exterior lighting, Garage lighting, domestic and fire water systems, and Common Area electrical components throughout the Complex.

112.    To the extent Landlord repairs or maintains any electrical system for a specific tenant in the Building, that cost is billed to the appropriate tenant and deducted from the Operating Expenses of the Complex.

113.    Tenants in the building are submetered for their electrical usage.

**P.      Facts Relating to Water at the Complex**

114.    Pursuant to its Lease obligations, Landlord provides the operation and maintenance for the central plant that provides the chilled water for the entire Building, which includes Fitness's Leased Premises.  In addition, Landlord maintains the domestic water and fire sprinkler water for the Complex.

115.    The Building has three (3) 400-ton chilled water units and only two (2) of the three (3) are normally operated.  There were two 350-ton direct exchange (air cooled) chillers added to the facility in 2013.  These units total 700 tons.  These units were added at the Landlord's sole expense.  They were added to allow the HVAC to be operated in the event of an unforeseen failure in the chilled water system.  The 700-ton air-cooled system does not use any condenser water and has no effect on increased water usage.

**Q.      Facts Relating to Engineering Staff**

116.    Landlord's engineering staff consists of eight individuals. There are three (3) engineers at the Complex during Monday-Friday 7:00 am to 3:30 pm. The current staffing schedule is as follows:

| Shift Time | # Building Engineers Monday-Friday | # Building Engineers Saturday-Sunday |
|---|---|---|
| 7:00 am – 3:30 pm | 3 | 1 |
| 3:00 pm – 11:30 pm | 1 | 1 |
| 11:00 pm – 7:30 am | 1 | 1 |

117.   On any calls from the tenants in the Building, including Fitness, requesting service or other needs, the staff person's time and material spent is billed back to that tenant and credited against Operating Expenses for the Building, with the exception of hot and cold calls. Hot and cold calls are documented through a work order system.

118.   The amount Landlord charges for engineering time is currently $29.52 per hour. Landlord calculated this figure by taking of an average of the compensation (inclusive of benefits) of the engineering staff.

119.   Fitness argues that Landlord must exclude the cost of some of the engineers who service the Building because they would not all be needed but for the 24-hour tenants. The Court disagrees. Nothing in the Lease gives Fitness the right to dictate how many engineers are needed on staff. In addition, even if additional engineers were needed because of the 24-hour tenants in the Building (a finding which the Court does not make), nothing in the Lease relieves Fitness from paying those costs. As discussed above, Section 6B(4) excludes the cost of the maintenance and service agreements for the Common Areas contained on the second floor and above, such as the hallways and public restrooms on other floors. But the Building systems are not Common Areas. Therefore Section 6B(4) does not exclude them. Nor does Section 6C(28) exclude these expenses, because as discussed above, Building engineers do not "only directly benefit" the 24-hour tenants. They benefit everyone in the Building.

19

**R.     Facts Relating to Janitorial Services at the Complex**

120.    Landlord employs one day porter to provide janitorial services for the Common Areas of the Complex (including the Garage).  The day porter keeps a schedule of his time.

121.    All tenants of the Building, including Fitness, provide and are responsible for janitorial services within each tenant's leased premises.

122.    Fitness argues that much of the day porter's cost should be excluded because he was cleaning restrooms and tenant spaces in the Tower, which are excluded under the Lease. Defendant's expert opined that the cleaning cost should instead be $2 per square foot, or $8,000 per year.

123.    But testimony revealed that the day porter actually spends little time in the Tower. The bulk of the day porter's duties are to do things like pick up gum from sidewalks, water plants, pick up trash in the Garage and on the first floor, etc. The time that the day porter spent in the Tower was removed from Landlord's estimate. The property manager testified that Landlord calculated the day porter's reduction at 2 hours per day, and removed that in the Revised 2009-2013 Statement. The Court will adopt that figure.[3]

**S.     Facts Relating to Elevators at the Complex**

124.    The Complex has eight (8) elevators which Landlord is obligated to maintain under the Lease.  (Lease, §7.A(8)). Four (4) of these elevators are passenger elevators in the tower portion of the Building. The other elevators are two (2) parking garage passenger elevators, one (1) freight elevator, and one (1) hydraulic passenger elevator within the Leased

---

[3] The Court does not fault Fitness for its estimate of the cleaning costs. Testimony revealed that Landlord may not have provided Fitness with all the records necessary to make an informed estimate. It is unfortunate that litigation was required to bring out the true figure. In any case, the Court credits Landlord's testimony on this issue.

Premises.  The garage elevators serve all garage levels, including the basement.  The freight elevator also serves the basement.

125.    Fitness's employees, customers and guests use the parking garage elevators often when parking in the garage as the elevators serve the lobby and basement.

**T.     Facts Relating to Management Fees**

126.    Landlord hired a company called Jones Lang LaSalle to manage the Property. Pursuant to §13.1(a) of the Management Agreement, Jones Lang LaSalle is to be paid a monthly management fee based upon a percentage interest of the Property's "Effective Gross Income." Pursuant to the First Amendment to Management Agreement, effective September 1, 2013, the management fee paid to Jones Lang LaSalle increased from 3% of Effective Gross Income to 3.9% of Effective Gross Income.

127.    Testimony showed that property management fees for this type of Building in the Houston Medical Center were between 3-5%.

128.    Management fees incurred by Landlord during all years of the Lease are commercially competitive management fees.

## II.     CONCLUSIONS OF LAW

1.    As discussed more fully above, Landlord's Revised 2009-2013 Statement (Exhibit 46) correctly sets forth the Operating Expenses owed by Fitness for those years with one exception: the Parking Garage is a commercial concession under the Lease and Landlord may not charge Fitness for the cost of compensation paid to clerks, attendants or other persons working there.

2.    There is not enough evidence before the Court regarding the 2014 expenses to make a conclusive determination. But the same logic that applies to 2009-2013 also applies to

2014. The Court expects the parties to resolve the 2014 operating expenses and future operating expenses in a manner consistent with this Order.

3.  Landlord did not abide by the Lease when it unilaterally changed the Building's Net Rentable Area from its original 315,000. All Operating Expenses should therefore be calculated using 315,000 as the Net Rentable Area. Landlord may alter the Net Rentable Area in the future in accordance with the terms of the Lease.

## A.  The Lease

3.  The Lease governs the Landlord and Tenant's obligations.

4.  The Letter of Intent was not legally binding on Landlord or Tenant.

5.  The terms and conditions contained in the Letter of Intent were superseded by the Lease terms.

6.  The filing of a lawsuit did not suspend any obligations under the Lease, which continues to be in full effect.

7.  Management fees incurred by Landlord during all years of the Lease are commercially competitive management fees.

8.  Landlord has not interfered with Fitness's peaceful and quiet possession and enjoyment of the Leased Premises.

## B.  Lease Language Construction

9.  Where a question concerning the meaning of a contract is presented, a court will (1) "take the wording of the instrument," (2) "consider the same in the light of the surrounding circumstances," and (3) "apply the pertinent rules of construction thereto and thus settle the meaning of the contract." *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 519 (Tex. 1968) (emphasis in original).

## C.       Ascertain Intent From The Words Used

10.       "In construing a written contract, [a court's] primary objective is to ascertain the parties' true intentions as expressed in the language they chose." *Id.*   Courts are to begin the "analysis with the language of the contract because it is the best representation of what the parties mutually intended." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (citation omitted).

11.       The intent of the parties is ascertained from the wording of the contract as a whole, considered in light of the surrounding circumstances out of which the contract grew, keeping in mind the purposes intended to be accomplished by the parties when entering into the contract. *French v. Michaels Stores, Inc.*, No. 3:12-CV-1569-L, 2013 WL 81998, at *6 (N.D. Tex. Jan. 8, 2013) (citing *Nat'l Union Fire Ins. Co. v. Ins. Co. of N. Am.*, 955 S.W.2d 120, 127 (Tex. App.—Houston [14th Dist.] 1997), aff'd, *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692 (Tex. 2000)).

12.       The language used in the Lease should be given its plain, ordinary and grammatical meaning. *See, e.g., Reilley v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987) (language should be given its "plain, grammatical meaning"); *Stahl Petroleum Co. v. Phillips Petroleum Co.*, 550 S.W.2d 360, 366 (Tex. Civ. App.—Amarillo 1977), aff'd, 569 S.W.2d 480 (Tex. 1978) (language should be given its "plain, ordinary and generally accepted meaning"); *Beaty v. Mar. Ass'ns—I.L.A. Pension, Welfare & Vacation Fund*s, 442 S.W.2d 823, 825 (Tex. Civ. App.—Houston [14th Dist.] 1969, writ ref'd (language should be given its "reasonable, natural and probable meaning when considered in relation to the whole"); *S. Texas Health Sys. v. Care Improvement Plus of Texas Ins. Co.*, No. 7:14-CV-912, 2016 WL 526374, at *5 (S.D. Tex. Feb. 9, 2016) (*quoting Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015)) (language should be given their "plain, common, or generally

accepted meaning unless the contract shows that the parties used words in a technical or different sense").

13.     Landlord's Revised 2009-2013 Statement is consistent with the plain language of the Lease and the intentions of the parties with the exception of its construction of the commercial concession term in the lease, as discussed above.

**D.     Harmonize And Give Effect To All Provisions - Sections 6.B And 6.C**

14.     The Court finds that Fitness's construction of Section 6.B(4) and Section 6.C(28) is inconsistent with the plain language of the Lease.

15.     Furthermore, the Court finds that Fitness's construction of Lease Section 6.B and Section 6.C fails because the Lease must be interpreted as a whole. Courts should "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014) (quoting *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006)). *See also Beaty*, 442 S.W.2d at 825 (the contract should be "viewed in its entirety and all of its integral parts must be considered and construed together").

16.     Lease Section 6.C does not replace or supersede the broad language and specific inclusions in Section 6.B.  Additionally, as stated in Section 6(B), Fitness's obligation to pay as Additional Rent its Pro Rata Share of Operating Expenses is not limited to only those expenses that might relate to the ownership, operation, management, maintenance, and repair of the Common Areas.  Fitness is obligated under the Lease to pay as Additional Rent its Pro Rata Share of "all" expenses and costs "in connection with the ownership, operation, management, maintenance and repair…of the Complex" except for those costs specifically excluded. (Lease,

§6.A, B, C). Fitness is obligated under the Lease to pay as Additional Rent its Pro Rata Share of Operating Expenses for the Complex.

17.    "Courts presume the parties to a contract intend every clause to have some effect."  *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Ctr. E., Inc.*, 290 S.W.3d 554, 560-61 (Tex. App.—Dallas 2009, pet. denied) (citing, *inter alia*, *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). If Fitness's construction of certain exclusions Section 6(C) were upheld, much of Section 6(B) would be rendered meaningless.

## E.    Application

34.    Landlord's Revised 2009-2013 Statement correctly sets forth the Operating Expenses with the exception of the costs associated with the Garage.

35.    The Lease permits the inclusion of the Garage expenses in the Operating Expenses for the purpose of calculating Additional Rent due from Fitness. However, the Lease requires Landlord to exclude from Fitness' Operating Expenses compensation paid to Republic Parking.

36.    The Lease does not permit Landlord to unilaterally change the Building's Net Rentable Area from its original 315,000. All Operating Expenses should therefore be calculated using 315,000 as the Net Rentable Area. Landlord may alter the Net Rentable Area in the future in accordance with the terms of the Lease.

## F.    Lease Interpretation For Future Years

23.    The parties shall apply the holdings of this Order in interpreting their obligations under the Lease in future years.

**G.      Other Conclusions Of Law**

24.      Considering that neither party was without fault in this litigation, the Court will not award attorney's fees or costs at this time**.** The parties may move for attorney's fees if they wish, and the Court will consider the request.

25.      This Court believes that this Order fully clarifies the parties' rights and obligations under the lease. Because the Court has adopted some financial figures from each party, neither party's request for judgment is appropriate. If necessary, the appropriate party should file a motion for entry of judgment consistent with this Order.

It is so ORDERED. 06/17/2016.

_____

The Honorable Alfred H. Bennett
United States District Judge